(C.D. 2644)

## F. B. Vandegrift & Co., Inc. *v.* United States

United States Customs Court, Second Division

(Decided April 4, 1966)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Richard J. Kaplan,* trial attorney), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: An importation of two complete oil fired tilting melting furnaces, types 320/500 and 600/1200, was classified as entireties by the collector of customs under the provisions of paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739,[1] as articles having as an essential feature an electrical element or device and consequently assessed with duty at the rate of 13¾ per centum ad valorem.

Plaintiff claims that with respect to certain firebricks and cement the classification is erroneous, and the merchandise is properly subject to duty at the rate of 5½ per centum ad valorem for the firebricks, as provided for under paragraph 201 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and at the rate of 5 per centum ad valorem for the cement under the provisions of paragraph 205(d) of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802.

It is the claim of plaintiff that said furnaces do not have as an essential feature an electrical element or device and, accordingly, are properly subject to duty at the rate of 12 per centum ad valorem under the provisions of paragraph 372 of said act, as modified by said sixth protocol, *supra*, which provides as follows:

Machines, finished or unfinished, not specially provided for:
*     *     *     *     *     *     *

    Other (except food preparing and manufacturing machinery; hydraulic reaction turbines and hydraulic impulse wheels; internal-combustion engines; and except wrapping and packaging machinery).

It is further claimed by plaintiff herein that said electric motors are separately dutiable at the rate of 11 per centum ad valorem under the provisions of paragraph 353 of said act, as modified by said sixth protocol, *supra*, which provides as follows:

Articles having as an essential feature an electrical element or device, * * * finished or unfinished, wholly or in chief value of metal, and not specially provided for:
*     *     *     *     *     *     *

    Motors:
        Of more than ⅒ horsepower but less than 200 horsepower _____ 11% ad val.

---

[1] Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:
*    *    *    *    *    *    *
    Other * * * _____ 13¾% ad val.

The record herein consists of the testimony of one witness called by the plaintiff and a catalog received in evidence as plaintiff's illustrative exhibit 1, as well as a stipulation entered into by and between counsel for the respective parties that items invoiced on two of the invoices as "a complete set of refractory bricks and cement for the above furnace" with invoice unit values of 152 British pounds and 133 British pounds, consist of replacement parts and do not consist of integral parts of the furnaces with which they were invoiced.

Mr. Rex Harrison, a partner of the firm which imported these furnaces, testified that he holds a degree in metallurgical engineering and is engaged in selling, installing, and servicing furnaces such as those in issue; that the function of the furnace is to create sufficient heat to melt metal; that the flame temperature would be approximately 3,200 degrees Fahrenheit; that this heat is created by the use of a blower which revolves and, through the centrifugal force of the blower, transmits air through air lines which air is mixed with the fuel and converted to heat in the combustion chamber; that the blowers are essential features in the operation of the furnaces and that some form of motor is required to operate the blower; that, in his opinion, electric motors, such as were attached to the imported furnaces may readily be substituted without substantial modification of the furnace *per se*, with gasoline, diesel, steam, or air motors.

The witness testified that to substitute the electric motor would require the removal of four bolts that hold the blower exit which would permit removal of the unit; that the unit would then be taken to a shop and four more bolts removed permitting the removal of the electric motor; that this is necessary since the motor shaft is keyed to the rotor of the blower and, therefore, in order to extract the motor, the blower unit would have to be removed; that then an air motor or any other form of power could be keyed directly into the existing rotor; that the electric motor can be utilized separately from the blowers where they meet the horsepower and r.p.m. specifications; that all the substitution of power requires is a shaft of the proper size to be inserted in the rotor which would have a pulley attached to it at approximately the position where the electric motor is now located and by belt operation attached to a proper source of power; that the belt system would require less than 1 day's time to install when all parts were previously ordered and on hand; that any firm in the generating field would have such articles; that he knows of his own knowledge that the manufacturer in England does produce such furnaces to operate by other than electric power; that all of the 86 furnaces he has seen have utilized electric motors; that, as imported, the electric motors are the only electrical feature of said furnaces.

Mr. Harrison also testified as to the mechanical features of the furnaces which consist of the tilting device and the mechanical doors which operate on the principle of lever and cam; that the tilting device is operated by a handwheel which turns a screw shaft thereby causing the furnace to go up and down or in an oscillating motion; that the threaded shaft being an inclined plane enables the furnace to go up and down with the application of less force; that the energy from the handwheel is transmitted through the shaft permitting the furnace to tilt up and down; that there are further mechanical aids in the form of four cast-iron rollers which enable the furnace to ride on tracks; that the operation of the tilting mechanism causes the wheels to move.

The witness testified that, in addition to the above, there are three mechanical doors which have cam locking devices; that the cam locking device operates on the cam and lever principle; that the locking device fits through the fork of each door and as pressure is applied downward on the handle, a cam exerts pressure against the door to keep it closed.

Mr. Harrison testified that both furnaces contain the same mechanical features except that type 600/1200 has a slightly different tilting mechanism which operates on a worm and rack instead of on a threaded screw.

Based upon the record, and particularly the stipulation relative to the two invoices covering the firebrick and cement the classification of the collector of customs as to those items is admittedly incorrect since it has been agreed that said merchandise consists of replacement parts and not integral parts of the imported furnaces. They are, therefore, properly dutiable at 5½ per centum ad valorem and 5 per centum ad valorem under paragraphs 201 and 205 (d), respectively, of said act, as modified, *supra*, as claimed.

While the involved furnaces fall within the common meaning of the term, "machine," as interpreted in *United States* v. *Idl Mfg. & Sales Corp.*, 48 CCPA 17, C.A.D. 756; *Nord Light, Inc.* v. *United States*, 49 CCPA 12, C.A.D. 786; *The Durst Mfg. Co., Inc.* v. *United States*, 50 CCPA 56, C.A.D. 820, nevertheless, in their condition as imported, the furnaces contained an electric motor which operated the blower and were, accordingly, classified under paragraph 353 of said act, as modified, *supra*.

The criteria for determination of whether an article has as an essential feature an electrical element or device was clearly set forth in the case of *United States* v. *Dryden Rubber Co.*, 22 CCPA 51, T.D. 47050, which case has been cited with approval for these many years. Basically, for an article to fall within the purview of an article "having as an essential feature an electrical element or device," the electrical feature must be essential and without which the article will not func-

tion normally for the purpose intended. The court, in the case of *Keer, Maurer Company* v. *United States*, 48 Cust. Ct. 205, C.D. 2336, in interpreting the criteria as set forth in the *Dryden* case, *supra*, stated, "In other words, if an article has been designed to operate by electrical power, and cannot normally function otherwise, it is an article with an essential electrical feature * * *. If, however, the substitution of nonelectric features for the electrical ones can be made without substantial modification or reconstruction of the functional properties of the machine, it is not an article having as an essential feature an electrical element or device within the meaning of said paragraph 353." See also *Ralph C. Coxhead Corp.* v. *United States*, 22 CCPA 96, T.D. 47080; *W. C. Sullivan & Company* v. *United States*, 46 Cust. Ct. 31, C.D. 2229.

In the case at bar, the record substantially establishes that the only electrical feature is the motor used to drive the blower and that said motor may be removed readily by the removal of eight bolts and a shaft substituted within the rotor of the blower in lieu of the shaft of the electric motor. After the removal of the motor and the insertion of the shaft, a pulley would be attached and by belt the power would be transmitted to the machine from either gasoline, diesel, or air motor. This substitution of power does not appear to require a substantial modification or reconstruction of the functional properties of the furnaces and, accordingly, removes the furnaces from the language of paragraph 353 of said act, as modified, *supra*. The fact that the witness had never seen any of the furnaces of the type involved herein operate by any means other than electricity or that these functions were previously intended to be operated by electricity is not fatal to the claim of plaintiff. In the case of *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 CCPA 128, C.A.D. 714, the court of appeals held that the fact that the cocoa liquor grinding mill involved therein was intended to be operated by electricity was not determinative of the issue. In that case, a pulley belt received the transmission of power as could the furnaces involved herein when the power source was substituted. The court therein held that the classification rests upon the condition of the article as imported and that said condition did not limit the drive to an electric motor. By the same token, in the case at bar, the record establishes that said furnaces, in their condition as imported, were not limited to an electric drive for the blowers irrespective of the fact that said motors were attached.

Since the record establishes that said furnaces fall within the purview of said paragraph 372 of said act, as modified, *supra*, they are properly subject to duty thereunder by virtue of the principles of the *Dryden* case and the *Baker Perkins* case, *supra*.

The claim for separate classification of the motors under the *eo nomine* provision for motors as provided for in paragraph 353 of said act, as modified, *supra*, is well founded. In the case of *Henry A. Wess, Inc.* v. *United States*, 43 Cust. Ct. 78, C.D. 2107, certain woodworking machines containing electric motors were classified under the same provisions of said paragraph 353 of the Tariff Act of 1930, as modified, *supra*, and claimed to be properly dutiable separately as machines under paragraph 372 of said act, as modified, *supra*, and the electric motors under paragraph 353 of said act, as modified, *supra*. The court therein found the articles separately dutiable and relied upon its decision in *Clarence S. Holmes* v. *United States*, 37 Cust. Ct. 260, C.D. 1833, which case in turn relied upon the decision in the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 41 CCPA 33, C.A.D. 525. The *Bush* case, *supra*, involved certain gas-operated saws which were held to be separately classifiable for tariff purposes. The court of appeals made the following pertinent comments:

The record indicates that different means of attachment might or would have to be employed from that used with the imported saws should the imported engine be detached and other power producing units used. There is absolutely no evidence however, appellant declares, that the engine itself must be altered to make it function as a power producing unit for various purposes which the engine will otherwise serve, nor that the sawing mechanism itself must be altered when propelled not by the gasoline motor but otherwise by compressed air or electric power.

\* \* \* \* \* \* \*

\* \* \* We think, however, as properly stated in *United States* v. *Myers & Co.*, 11 Ct. Cust. Appls. 409, T.D. 39322, wherein the skins and veal of imported carcasses of calves were held separately classifiable for tariff purposes—

that the question herein submitted finds its answer in the established rule that where an importation consists of two distinct and segregable tariff entities, which, however, are attached to one another or commingled together, they should nevertheless be separately treated in the assessment each accordingly bearing the rate of duty applicable to it, or admitted free of duty if entitled thereto.

In the case at bar the gasoline engine is not indispensable as the power producing element in the operation of the saws because electricity or compressed air may likewise provide the power to effect the same result; that the gasoline engine may be readily detached from the saw assembly by the removal with a monkey wrench of four or eight nuts, depending on the model of the saw; that when so detached, or in the first instance, the gasoline engine may be used for various other purposes and in various other ways, such as driving a pump or propelling a motor boat. \* \* \*

The instant record establishes that the motor involved herein, when removed, could be used for any purpose within its horsepower and

r.p.m. rating. Accordingly, it would appear that the motors were not specifically designed for use with the imported furnaces. See *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849. This being so, said motors should have been properly subject to duty at the rate of 11 per centum ad valorem under the *eo nomine* provision for motors contained in paragraph 353 of said act, as modified, *supra*, as claimed.

Since the appraisement of the contested article was predicated on the basis that each furnace with its motor constituted an entirety, no separate value for each of said items has been returned by the appraiser. Accordingly, the appraisement herein is invalid and void, and the liquidation of the entry premature and a nullity by virtue of the absence of a legal appraisement. The protest is, therefore, dismissed in accordance with the provisions of 28 U.S.C., section 2636(d), and the matter remanded to a single judge to determine the proper dutiable value of the furnaces and the electric motors in the manner prescribed by law. The claim in the protest is, however, sustained as to the merchandise covered by the two invoices and described as "complete set of refractory bricks and cement for the above furnace," having unit invoiced values of 152 and 133 British pounds, which values are stipulated to be correct values.

Judgment will be entered accordingly.